## 23-MJ-02759-TORRES

AO 91 (Rev. 11/11)   Criminal Complaint

# UNITED STATES DISTRICT COURT
for the

Middle District of Florida

FILED BY ___ MM ___ D.C.

Apr 19, 2023

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - MIAMI

| | | | |
|---|---|---|---|
| United States of America | ) | | |
| v. | ) | | |
| SERGEY KARPUSHKIN | ) | Case No. | |
| | ) | | 6:23-mj-1408 |
| | ) | | |
| | ) | | |
| _____ | ) | | |
| Defendant(s) | | | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of   June 2019 through March 2021   in the county of   Orange and elsewhere   in the

_____ Middle _____ District of _____ Florida _____ , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 50 U.S.C. § 1705(a) and (c) | Conspiracy to violate the International Emergency Economic Powers Act ("IEEPA"). |

This criminal complaint is based on these facts:

See attached affidavit.

☑ Continued on the attached sheet.

_____
Complainant's signature

Special Agent Tyler Bauer, FBI
_____
Printed name and title

Sworn to before me over the telephone or other reliable electronic means and signed by me
pursuant to Fed. R. Crim. P. 4.1 and 4(d).

Date:   4/18/23

_____
Judge's signature

City and state:   Orlando, FL

Robert M. Norway, U.S. Magistrate Judge
_____
Printed name and title

**STATE OF FLORIDA**

**COUNTY OF ORANGE**

CASE NO. 6:23-mj- 1408

**AFFIDAVIT**

I, Tyler Bauer, being duly sworn, state the following:

**Agent Background**

1.      I am a Special Agent ("SA") with the Federal Bureau of Investigation ("FBI") and have been so employed since March 2019. I am currently assigned to a squad in the FBI Tampa Field Office, Orlando Resident Agency, which investigates national security matters. I am a law enforcement officer authorized to investigate and enforce violations of federal crimes. I have received law enforcement training at the FBI Academy. While employed at the FBI, I have investigated both criminal and national security matters, including violent criminal enterprises, criminal street gangs, counterterrorism, and counterintelligence matters.

**Purpose of Affidavit**

2.      The information set forth herein is based on the following: (a) my own personal observations and my review of evidentiary documents; (b) information that I received from other law enforcement officers involved in this investigation, including by reviewing official reports prepared by other law enforcement officers; (c) interviews of witnesses and the review of reports

summarizing the interviews of witnesses; and (d) information provided to me by law enforcement officials who met with and interviewed said witnesses.

3. Because this affidavit is being submitted for the limited purpose of establishing probable cause for the issuance of a criminal complaint, I have not set forth each and every fact that I learned as a result of this investigation. Rather, I have set forth only those facts that I believe are necessary to establish probable cause that a violation of federal law has been committed. Unless otherwise noted, all statements of other persons described in this affidavit are set forth in substance and in part, rather than verbatim.

4. As set forth below, there is probable cause to believe that beginning no later than on or about June 2019, and continuing until at least March 2021, in the Middle District of Florida and elsewhere, SERGEY KARPUSHKIN ("KARPUSHKIN") conspired with others to violate and evade, and attempt to violate and evade, U.S. sanctions against Sergey Vitalievich Kurchenko ("Sergey Kurchenko" or "Kurchenko"). More specifically, there is probable cause to believe that KARPUSHKIN did knowingly and willfully combine, conspire, confederate, and agree with JOHN C. UNSALAN ("UNSALAN") and others to violate the International Emergency Economic Powers Act ("IEEPA"), in violation of 50 U.S.C. § 1705(a) and (c).

## RELEVANT LAW AND REGULATIONS
### IEEPA and the Ukraine-/Russia-Related Sanctions Regulations

5.      The International Emergency Economic Powers Act, 50 U.S.C. §§ 1701-1708, provides the President of the United States authority "to deal with any unusual and extraordinary threat, which has its source in whole or in substantial part outside the United States, to the national security, foreign policy, or economy of the United States." 50 U.S.C. § 1701(a). Pursuant to that authority, the President may declare a national emergency through Executive Orders that have the full force and effect of law. Among other things, IEEPA empowers the President to "investigate, block . . . regulate, . . . prevent or prohibit, any acquisition, holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest by any person, or with respect to any property, subject to the jurisdiction of the United States."  IEEPA further empowers the President to "issue such regulations . . . as may be necessary for the exercise of the authorities granted" by IEEPA.

6.      IEEPA further provides that it is a crime to willfully violate, attempt to violate, conspire to violate, or cause a violation of any order, license, regulation, or prohibition issued pursuant to IEEPA. 50 U.S.C. § 1705(a) and (c).

7.      In March 2014, pursuant to IEEPA, the President issued Executive Orders 13660, 13661, and 13662 authorizing the Secretary of the Treasury, in consultation with the Secretary of State, to block all property and interests in property of persons involved in the Russian Federation military invasion of the Crimea region of Ukraine, including persons operating in the defense and related materiel sector of the Russian Federation.

8.      Pursuant to these Executive Orders, the Secretary of the Treasury promulgated the Ukraine-/Russia-Related Sanctions Regulations (Title 31, Code of Federal Regulations, Part 589), which generally prohibit any U.S. person from conducting business with persons or entities on the U.S. Department of the Treasury's Specially Designated Nationals and Blocked Persons List ("SDN"), which is managed by the Treasury Department's Office of Foreign Assets Control ("OFAC"). Specifically, the Ukraine-/Russia-Related Sanctions Regulations state that:

> The prohibitions . . . of this section include prohibitions on the following transactions: (1) The making of any contribution or provision of funds, goods, or services by, to, or for the benefit of any person whose property and interests in property are blocked pursuant to paragraph (a) of this section; and (2) The receipt of any contribution or provision of funds, goods, or services from any person whose property and interests in property are blocked pursuant to paragraph (a) of this section.

31 C.F.R. § 589.201(b). The regulations specify that "the term *person* means an individual or entity." *Id.* § 589.329 (emphasis in original).

9.     The Ukraine-/Russia-Related Sanctions Regulations further provide that "[a]ll transactions prohibited pursuant to [Executive Order 13660 of March 6, 2014, Executive Order 13661 of March 16, 2014, and Executive Order 13662 of March 20, 2014 (the 'Ukraine-Related Executive Orders')], are also prohibited pursuant to this part." 31 C.F.R. § 589.201. According to Section Four of Executive Orders 13660, 13661, and 13662, "[t]he prohibitions … of [these] order[s] include but are not limited to: (a) the making of any contribution or provision of funds, goods, or services by, to, or for the benefit of any person whose property and interests in property are blocked pursuant to this order; and (b) the receipt of any contribution or provision of funds, goods, or services from any such person."

10.     Further, according to Section 5(a) of Executive Orders 13660, 13661, and 13662, "[a]ny transaction that evades or avoids, has the purpose of evading or avoiding, causes a violation of, or attempts to violate any of the prohibitions set forth in this order is prohibited." Finally, Section 5(b) of these Executive Orders makes unlawful any conspiracy to violate the prohibitions set forth in the orders.

11.     On July 30, 2015, pursuant to Executive Order 13660, OFAC designated Sergey Vitalievich Kurchenko ("Kurchenko")[1] as an SDN and blocked his property and interests in property. In the absence of a license to

---

[1] Specifically, OFAC designated the following names and aliases: "KURCHENKO, Sergey Vitalievich (a.k.a. KURCHENKO, Serhiy; a.k.a. KURCHENKO, Serhiy Vitaliyovych")"

the contrary, U.S. persons are prohibited from contributing funds, goods, or services to Kurchenko or for his benefit. Similarly, absent such a license, U.S. persons are prohibited from receiving any contribution of funds, goods, or services from Kurchenko. 31 CFR § 589.201. Collectively, IEEPA, the Ukraine-/Russia-Related Sanctions Regulations, and the Ukraine-Related Executive Orders are referred to in this affidavit as the "U.S. Sanctions."

12.     OFAC designated Kurchenko for being responsible for or complicit in, or having engaged in, directly or indirectly, misappropriation of state assets of Ukraine or of an economically significant entity in Ukraine. *See* June 30, 2015 OFAC Press Release, "Treasury Sanctions Individuals and Entities Involved In Sanctions Evasion Related To Russia and Ukraine" (available at https:/home.treasury.gov/news/press-releases/jl0133). On January 26, 2018, OFAC designated two related entities, ZAO Vneshtorgservis ("Vneshtorgservis") and Kompaniya Gaz-Alyans, OOO ("Gaz-Alyans") for having acted or purported to act for or on behalf of, directly or indirectly, the so-called Donetsk People's Republic ("DPR") and the so-called Luhansk People's Republic ("LPR"), which are in the Donbass region of Ukraine. *See* January 26, 2018 OFAC Press Release, "Treasury Sanctions Additional Individuals and Entities in Connection with the Conflict in Ukraine and Russia's Occupation of Crimea" (available at https://home.treasury.gov/news/press-releases/sm0266). Further, the January 26, 2018 OFAC Press Release stated that "ZAO Vneshtorgservis has

6

worked with the company Gaz-Alyans, OOO, which is controlled by Sergey
Kurchenko, to export coal from the separatist-controlled regions to
Europe." *Id.*

## PROBABLE CAUSE

### Background

13.    Metalhouse, LLC was registered in the State of Florida as a
Limited Liability Company on February 2, 2014, and listed its registered agent
as being JOHN UNSALAN. In a Florida Limited Liability Company Annual
Report filed on March 23, 2021, UNSALAN was listed as being an
Authorized Member for Metalhouse. Metalhouse is located in Orlando,
Florida. According to Metalhouse's business website
(https://metalhouse.us/), Metalhouse operates in the steel industry by trading
and distributing raw steel-making materials globally.

14.    On April 12, 2023, a federal grand jury returned a 22-count
indictment charging UNSALAN with Conspiracy to Violate IEEPA and the
Ukraine-/Russia-related Sanctions Regulations, under 50 U.S.C. § 1705;
substantive violations of IEEPA and the Ukraine-/Russia-Related Sanctions
Regulations, under 50 U.S.C. § 1705; Conspiracy to Commit International
Money Laundering, under 18 U.S.C. § 1956(h); and substantive violations of
International Money Laundering, under 18 U.S.C. § 1956(a)(2)(A).  *See*
Middle District of Florida Case No. 6:23-cr-70-WWB-EJK, Doc. 1.  These

violations all concerned business transactions between Metalhouse and companies owned and controlled by Kurchenko.

15.  As confirmed by email records and text message records obtained by FBI investigators, and as further set forth below, between 2018 and 2021, KARPUSHKIN helped facilitate the business transactions that Metalhouse engaged in with companies controlled by Kurchenko.

16.  Thus, UNSALAN, KARPUSHKIN, and others conspired, orchestrated, and carried out a scheme to violate IEEPA by willfully conducting monetary transactions with and for the benefit of Sergey Kurchenko, an oligarch located in Russia who was designated by OFAC as an SDN, without first having applied for and received a license from OFAC. During the relevant period, Metalhouse, UNSALAN, and KARPUSHKIN engaged in transactions valued at over $150 million with entities that they knew were beneficially owned and controlled Kurchenko.

**Companies A and B**

17.  One of these entities beneficially owned and controlled by Kurchenko with which UNSALAN and KARPUSHKIN conducted business transactions was a business incorporated in Hong Kong ("Company A") that maintained a bank account in Saint Petersburg, Russia. UNSALAN and KARPUSHKIN both knew that Company A was beneficially owned and controlled by Kurchenko, whom both UNSALAN and KARPUSHKIN also referred to as "Mr. K.".

18.     Another entity beneficially owned and controlled by Kurchenko with which UNSALAN and KARPUSHKIN conducted business transactions was a business incorporated in Cyprus ("Company B"). UNSALAN and KARPUSHKIN both knew that Company B was owned and controlled by Kurchenko.

**Between April 2020 and March 2021, UNSALAN and KARPUSHKIN willfully engaged in over $18 million in transactions with Kurchenko through Company A**

19.     Between in or about April 2020 and in or about March 2021, Metalhouse entered into at least 24 purchase orders with Company A, signed by UNSALAN, in which Metalhouse agreed to purchase a total of over $35 million in metal products from Company A, including pig iron, square billets, and wire rods.  Pursuant to these purchase orders, between in or about August 2020 and in or about March 2021, Metalhouse wired Company A over $18 million.

20.     In August 2020, KARPUSHKIN emailed another individual with the initials A.P., on an encrypted messaging service, explaining that KARPUSHKIN was working with UNSALAN, and that they were purchasing goods through Company A from a "Mr. K," *i.e.* Kurchenko, who owed them at least $21 million:

> Regarding our conversation yesterday, the company from which I am working with Mr. K is called Metalhouse. The front man of the company is Mr. Can[2] Unsalan. We are partners in this project. Mr. K officially

---
[2] "Can" is UNSALAN's middle name.

> confirms there is an unpaid balance of 21 million dollars (See their official data further in the text). In fact it is a little more but I suggest starting with their figures. We have an agreement that they will be paying one million dollars to us monthly (see the document below). They have been violating the agreement for twelve months already. I need to understand if it is realistic to return part of it / everything and how much the services will cost.

The words "front man" were in English while the rest of the message was in Russian.[3] KARPUSHKIN then sent A.P. two documents, one of which was a September 2019 addendum to a contract between Company A and Metalhouse.

21.    On or about this same date, KARPUSHKIN sent via electronic message a copy of a May 22, 2020 letter from Metalhouse's General Manager and In-House Counsel to Company A with a carbon copy directed to "Sergey Vitalievich Kurchenko." The letter sought to reduce the amount Metalhouse owed to Company A under the same underlying contract.

22.    By in or about February 2021, Company A's outstanding balance with Metalhouse, *i.e.* Metalhouse's total payments to Company A minus the value of goods shipped by Company A, had reached $26 million. On or about February 27, 2021, UNSALAN messaged a Russian national business associate, stating "I need your help because I have receivable from kurchrnko [sic] 26m$ and can't get anything do you know any one Strong in government to push him." Less than two weeks later, on or about March 11,

---

[3] The quotation in the text is a preliminary draft translation that is subject to revision.

2021, Metalhouse forwarded to Company A personnel a table that showed Company A owing Metalhouse a balance of over $26 million.

23.     In a "Final notice" that was sent to Company A on or about March 15, 2021, UNSALAN stated that "I'm writing this letter to remind you of the unfulfilled contracts until to date and your past due balance" of $26.4 million. In his letter, UNSALAN identified seven past due shipments, corresponding to seven purchase orders that Metalhouse had executed with Company A between in or about August 2020 and in or about December 2020, through which Metalhouse agreed to purchase over $13.79 million in pig iron, square billets, and wire rods.

24.     In addition, in a series of messages dated on or about October 23, 2020, UNSALAN told a business associate that "[w]e book cargo from Kurchenko and I have info cargo of pig iron which I paid for is being offered to you." These messages included copies of commercial invoices that UNSALAN forwarded to the business associate, which correspond to $1.179 million in wire payments that Metalhouse sent to Company A between on or about October 21, 2020, and on or about October 30, 2020. UNSALAN told his business associate that "[t]his is my cargo . . . He [Kurchenko] is offering my cargo to your company now[.] I kindly ask you to refuse purchase of this cargo from Gaz Aliiance as we paid for it several times." Gaz-Alyans is controlled by Kurchenko and was designated by OFAC in January 2018 as an SDN for having acted or purported to act for or on behalf of the so-called

11

Donetsk People's Republic and Luhansk People's Republic in the separatist-controlled regions of eastern Ukraine. In another message, UNSALAN also stated that "Kurchenko is offering our cargo" to another individual.

25.     Similarly, on or about March 17, 2021, UNSALAN expressed frustration to an individual whom UNSALAN understood served as an intermediary for Kurchenko (the "Kurchenko Intermediary") that Kurchenko had not yet shipped metal products that Metalhouse had purchased from Kurchenko:

> When will you ship my 7000 tons of billets + 5000 tons Wire rods I paid in December . . . It is March. Now you are stealing my funds . . . you seem to be a nice person why don't you understand what Mr Kurchenko [is] doing is wrong . . . If you understand why do you still assist him. Why are you being part of this crime gang . . . Prove me I'm wrong and you can give my cargo.

This inquiry corresponded to two December 2020 purchase orders in which Metalhouse had agreed to purchase 7,000 tons of steel billets for $3.535 million and 5,000 tons of wire rods for $2.75 million from Company A. In response, the Kurchenko Intermediary stated: "Will translate and forward all this to mr. K. You know well and saw it many times on your meetings with him and on your calls that only he makes all decisions."

26.     Like UNSALAN, KARPUSHKIN engaged in these transactions with Company A despite knowing that the ultimate beneficiary of these transactions was SDN Sergey Kurchenko. In a series of messages sent to KARPUSHKIN by a business associate on December 29, 2019, the associate

provided a large amount of information regarding Kurchenko and his business operations, including that Gaz-Alyans and Company A were controlled by Kurchenko, and that Company A "exported the products." KARPUSHKIN responded to the business associate's messages that "There is nothing new here. Everyone who is aware of this knows," followed by "It's an open secret so to speak."

**Metalhouse willfully engaged in over $43 million in transactions with Kurchenko through Company B**

27.     In or about June and July of 2019, Metalhouse entered into two contracts to buy metal products from Company B. Pursuant to these contracts (the "Company B Contracts"), between in or about July 2019 and in or about September 2019, Metalhouse paid Company B $10.53 million, and Company B delivered to Metalhouse three shipments totaling 19,950 tons of steel billets at a contracted price of $385 per ton, for a total value of $7.68 million. In or about September 2019, Metalhouse and Company B entered into an addendum to the Company B Contracts, signed by UNSALAN in his capacity as Director of Metalhouse, confirming that, as of September 12, 2019, Company B owed Metalhouse a balance of $2.84 million under the contracts.

28.     Between in or about September 2019 and in or about April 2020, Metalhouse and Company B entered into at least fourteen purchase orders through which Metalhouse agreed to purchase an additional $34 million in metal products from Company B, including steel billets, pig iron,

and wire rods. Pursuant to these purchase orders, between on or about September 19, 2019, and in or about June 2020, Metalhouse wired over $33.5 million to Company B. Company B, in turn, shipped a large number of metal products to Metalhouse.

29.     UNSALAN and KARPUSHKIN made these payments and received these goods from Company B despite knowing that Company B was beneficially owned and controlled by SDN Sergey Kurchenko. In a series of encrypted messages sent between in or about September 2020 and in or about July 2021, UNSALAN and the Kurchenko Intermediary repeatedly referred to Kurchenko both by name and as "Mr. K." In a message on or about April 6, 2021, UNSALAN stated that there were rumors "[t]hat Mr K [*i.e.*, Kurchenko] lost everything" and that "[w]e propose him to pay 1.9 million usd on behalf of [Company B] on April 19 as he promised . . . . Please let me know about payment for [Company B] . . . [a]s he promised." The Kurchenko Intermediary responded, "Ok, will ask Mr K also about it." Similarly, on or about April 24, 2021, UNSALAN messaged the Kurchenko Intermediary to explain that "I'm expecting money [from Kurchenko], we paid you money, you got money and you didn't deliver products[.] [T]here are two solutions: 1) You pay money back 2) you load cargoes. Now you are delayed and we don't believe you can produce steel anymore, so we want option 1," *i.e.*, payment of the $1.9 million. Similarly, in a September 2020 e-mail from UNSALAN to KARPUSHKIN and others, UNSALAN stated that "In the meeting with Mr.

K we agreed for balance [$]19'400'000 including [Company B] + [Company A] VS METALHOUSE + [Company A] VS [another company beneficially owned and controlled by UNSALAN] + DEMURRAGES." Elsewhere in the chain, in a message on which KARPUSHKIN was copied, UNSALAN wrote "Long story short unless all numbers showing what we agreed with Mr. Kurchenko we will not sign anything."

**Additional KARPUSHKIN email and text communications show that he participated in Metalhouse's transactions with Kurchenko-controlled companies**

30.     In March 2023, KARPUSHKIN arrived at Fort Lauderdale International Airport from Costa Rica and U.S Customs and Border Protection ("CBP") conducted a border search of KARPUSHKIN and the devices in his possession. The border search of the cell phone in KARPUSHKIN's possession revealed a number of communications showing that KARPUSHKIN helped facilitate Metalhouse's transactions with Kurchenko entities, including the following:

                    a.   An October 2017 conversation between KARPUSHKIN and V.B.,[4] a Russian business associate of Kurchenko who helped coordinate business deals for the Kurchenko-controlled entities, discussing a business transaction involving a Turkish company and Metalhouse.

---

[4] In August 2017, KARPUSHKIN received an e-mail copying V.B. showing V.B.'s alias as "Gaz-Alyans V[]." As noted above, Gaz-Alyans is controlled by Kurchenko and was sanctioned by OFAC in January 2018.

    b.  A November 2018 email in which a representative for a Russian shipping agency emailed UNSALAN, V.B., KARPUSHKIN, and two other individuals about an outstanding payment related to a Company A shipment. In the email, the shipping agency employee stated, "That's why my proposal from very early was to both the sides: METHOUSE and [Company A], actually Mr.John [UNSALAN] and [V.B.] to solve this matter directly and confirm to us WHO'LL COVER [to a third party] this particular expenses."

    c.  An August 2020 message from KARPUSHKIN to an individual with the initials R.M., who was the majority shareholder and founder of a metal trading company. In the exchange, KARPUSHKIN stated, "My partner for Turkish biz (Can Unsalan) asks your phone number. He wants to talk to you about [Company A] shipments. Pretty much just to get an update how u do." R.M. responded by stating, "I want to avoid that he will use our name towards [Company A] and that he spoke to us." KARPUSHKIN then stated, "I work with him closely but Turks are Turks and I always watch what and how I am saying things."

31.     During the March 2023 border inspection of KARPUSHKIN by CBP, KARPUSHKIN initially falsely stated he did not know V.B., but stated that he knew that Kurchenko's secretary reported directly to V.B., and that he knew this because the secretary was from his hometown. When CBP confronted KARPUSHKIN about his text message exchanges with V.B. in his phone, which spanned from 2017 to 2022, KARPUSHKIN stated that he was scared so he had lied about not knowing V.B. KARPUSHKIN further stated that Kurchenko was not a good person and falsely stated that he did not do business with Kurchenko.

**UNSALAN and KARPUSHKIN jointly participated in the transactions with Kurchenko entities and shared in Metalhouse's profits**

32.     Between August 21, 2019 and July 7, 2020, Metalhouse agreed to seven purchase orders with Company A and twenty-one purchase orders with Company B. The Company A purchase orders were worth an approximate total of $9.9 million, while the Company B purchase orders were worth an approximate total of $53.1 million. UNSALAN signed each of the purchase orders and KARPUSHKIN was included in emails pertaining to each of these orders.

33.     For example, on September 17, 2019, a Company B representative emailed UNSALAN and KARPUSHKIN regarding their purchase of 14,000 metric tons of steel billets from Company B, stating "Dear John / Sergey, Please find attached new PO [purchase order] for 14,000 MT

of Steel Billets countersigned by us." This email attached a purchase order bearing signatures and stamps from both Metalhouse and Company B memorializing the transaction.

34. As another example, on November 12, 2019, a business representative sent a purchase order to both UNSALAN and KARPUSHKIN, in which Metalhouse had agreed to purchase $1,560,000 worth of wire rods from Company A.

35. In addition, on December 28, 2019, KARPUSHKIN sent an email to Company B representatives, copying UNSALAN, among others, in which KARPUSHKIN stated, "[a]s agreed earlier please find attached draft of the new PO [purchase order] for 10000 mt [metric tons] of pig iron out of January production. . . . If you have any remarks please let us know." The email attached a purchase order proposing that Company B sell $2,900,000 worth of pig iron to Metalhouse.

36. From at least August 2017 to January 2020, UNSALAN and KARPUSHKIN sent each other several "profit sharing" spreadsheets. For example, in an August 2017 email titled "volgobalt 214 profit-," KARPUSHKIN told UNSALAN, "I see our (you + me) profit, which is 50% from total net profit in amount of 28,803.26 USD, right? I assume we need to share 2846.38 mt * 5 USD/t = 14,231.9 USD with the guys and only balance amount of 14,571 .36 is actually our (you + me) real profit."

37.     Similarly, in October 2019, UNSALAN sent KARPUSHKIN a spreadsheet titled "PROFIT CALCULATIONS / SERGEY K[ARPUSHKIN] – METALHOUSE." The first workbook within the spreadsheet, labeled "TOTALS," had a chart with three columns: "Vessel," "Product" and "Total." The "Total" column listed the dollar value of each shipment. The bottom of the spreadsheet then listed a total dollar value which appeared to be the total profit to be shared by KARPUSHKIN and UNSALAN. The second workbook within the spreadsheet, labeled with the name of a different trading company associated with Kurchenko, had a similar three-column chart. Below the chart, the spreadsheet stated the following:

| Outstanding Credit in ████ Trading Group SRO | $ (7,045,000.00) |
|---|---|
| | |
| 33% SERGEY KARPUSHKIN | $ (2,324,850.00) |
| 33% UNSALAN | $ (2,324,850.00) |
| 33% ████ | $ (2,324,850.00) |

**KARPUSHKIN was knowledgeable regarding the U.S. Sanctions Regime**

38.     Records from the March 2023 CBP border search of the phone in KARPUSHKIN's possession indicate that KARPUSHKIN, who has lived in the United States since approximately 2004 and has engaged in international metal transactions using his U.S.-based trading business for many years, was knowledgeable about U.S. sanctions. He engaged in a number of conversations with others related to the U.S. sanctions regime. For example, the U.S. Treasury Department maintains a publicly accessible

OFAC search tool to enable businesses and private parties to search the OFAC sanctions list to identity sanctioned and designated entities with which they cannot do business. On August 30, 2017, KARPUSHKIN emailed a link to this OFAC search tool to an associate. In August 2021, a business associate sent to KARPUSHKIN via electronic message a copy of Executive Order 14038 pertaining to OFAC restrictions on Belarus. In the message, the business associate sought KARPUSHKIN's perspective on this OFAC sanctions issue, stating, "You know more about the situation in Belarus than I do."

39. UNSALAN and KARPUSHKIN even discussed generating certificates for sanctioned goods expropriated by the Russians from Ukraine that would suggest that the goods, in fact, originated in Russia. Specifically, on or about July 15, 2017, UNSALAN forwarded KARPUSHKIN an e-mail inquiry from a bank indicating that a letter of credit would likely be issued for a particular transaction so long as it did not involve sanctioned goods ("Hi John . . . I need to make you aware that any [letters of credit] involving shipments from or to Russia must be reviewed and approved by our Trade Controls area . . . I do not anticipate any problems as long as the transaction does not violate any current sanctions."). UNSALAN further indicated to KARPUSHKIN that to bypass this issue, the supplier of the goods would need to doctor the certificates for the goods:

We will declare the goods are made in Russia. Which mill will issue the MTC ["mill test certificate"] in case bank is asking for it? If it's Yankiyeve Iron and Steel Works Public Joint Stock Company (PJSC) – [it] means showing Makeyvka, do they have alternative way to provide MTC printed out by another mill in Russia.

Yanikiyeve (Yenakiyeve) and Makeyvka (Makiivka) are both located in the sanctioned Donetsk region of Ukraine. KARPUSHKIN responded by stating that if this was for wire rod coils, he would need to "ask the guys."

## **Conclusion**

40.     Based on the foregoing facts and evidence, I believe that probable cause exists to charge KARPUSHKIN with conspiracy to violate the International Emergency Economic Powers Act ("IEEPA"), in violation of 50 U.S.C. § 1705(a) and (c).

This concludes my affidavit.

_____
Tyler Bauer
Special Agent, FBI

Affidavit submitted by email and
attested to me as true and accurate via
Zoom/videoconference consistent with
the Federal Rules of Criminal
Procedure 4.1 and 41(d)(3), this ___18th___
day of April, 2023.

_____
The Honorable Robert M. Norway
United States Magistrate Judge

21